******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## LISA FRONSAGLIA *v.* BENIGNO FRONSAGLIA
### (AC 42685)

Lavine, Moll and Bishop, Js.*

*Syllabus*

The defendant appealed to this court from the judgment of the trial court dissolving his marriage to the plaintiff and issuing certain financial orders. *Held*:

1. Contrary to the defendant's claim, the trial court did not abuse its discretion in issuing its financial orders by making a grossly disproportionate property distribution in the plaintiff's favor and assigning the majority of the marital debt to the defendant; that court's property distribution was not grossly disproportionate, as the defendant had dissipated $550,000 of marital assets in violation of the automatic orders, and the court merely reattributed those assets to the defendant.

2. There was ample evidence before the trial court to support its finding that the defendant had actual earnings of $160,000; evidence in the record of the defendant's past earnings and spending habits, as evinced by his bank statements and credit card accounts, supported the court's finding, and the defendant's reliance on *Keusch* v. *Keusch* (184 Conn. App. 822) was misplaced, as the reasoning in that case on which he relied had no bearing on the merits of this case.

3. The defendant could not prevail on his claim that the trial court erred by basing its alimony award to the plaintiff solely on his gross income rather than on his net income; the record revealed that that court did not rely solely on the defendant's gross income in determining its alimony award and that it did not state that it relied on the defendant's gross income, but merely referenced it; moreover, although the court did not expressly state that it considered the defendant's net income, this court inferred that it considered the relevant statutory factors (§ 46b-82) and all of the evidence submitted by the parties.

4. The defendant's claim that the trial court abused its discretion by awarding alimony to the plaintiff to punish him for his purported misdeeds was unavailing; that court was permitted to take into consideration all the causes for the dissolution of the marriage in fashioning its alimony award, including the defendant's extramarital affair and poor business decisions.

Argued October 15, 2020—officially released February 23, 2021

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Fairfield and tried to the court, *Grossman, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to this court; thereafter, the court, *Grossman, J.*, issued an articulation of its decision. *Affirmed*.

*William W. Taylor*, for the appellant (defendant).

*Campbell D. Barrett*, with whom were *Johanna S. Katz* and, on the brief, *Jon T. Kukucka*, for the appellee (plaintiff).

*Opinion*

BISHOP, J. The defendant, Benigno Fronsaglia, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Lisa Fronsaglia. On appeal, the defendant claims that the court (1) abused its discretion in fashioning its financial orders by making a grossly disproportionate property distribution in the plaintiff's favor and by assigning the majority of the marital debt to him, (2) erred by basing its orders on the defendant's assumed earning capacity of $160,000, where no evidence existed to support the earning capacity determined by the court, (3) erred in basing its alimony award on gross income rather than net income, when there was no evidence to support a net income based on the defendant's assumed gross income, and (4) abused its discretion by awarding alimony to the plaintiff to punish the defendant for his purported misdeeds. We affirm the judgment of the trial court.

The following facts, as found by the trial court or as undisputed in the record, and procedural history are relevant to our resolution of this appeal. The parties were married on June 20, 1992, in Trumbull. They have two children, one of whom was a minor at the time of the dissolution. The plaintiff commenced the dissolution action on November 28, 2016, seeking a dissolution of her marriage to the defendant on the ground that the marriage had broken down irretrievably without the chance of reconciliation. The plaintiff also sought, inter alia, joint legal and primary physical custody of the minor child, equitable distribution of all marital debts and assets, and orders for payment of alimony, child support, postsecondary education, and attorney's fees. At the time of the dissolution proceeding, the plaintiff was fifty-two years old and working as a registered nurse. The defendant was fifty-four years old with a bachelor's degree in business and working as a self-employed businessman importing and selling furniture through his limited liability company, Meeting International.

During the pendency of the action, the court incorporated into an order the parties' pendente lite stipulation in which the defendant agreed, inter alia, to continue to pay the mortgage for the family home, cell phone bills, automobile insurance, homeowners insurance, and other household bills.

On November 7, 2018, after a five day trial, the court issued an oral ruling, which was later signed as its memorandum of decision, dissolving the marriage and issuing financial orders. In its decision, the court found the plaintiff's gross income to be $115,000 per year, and the defendant's gross income for 2018 to be $160,000.

During the pendente lite period, the defendant terminated his association with emuamericas, LLC, a furniture wholesale company based in Italy with which he had been doing business for many years. In doing so, the

defendant sold his 12.5 percent interest in emuamericas, LLC, for $550,000 without the court's permission and without informing the plaintiff. The defendant disclosed that he depleted the entire $550,000 sum pendente lite. The defendant had also invested tens of thousands of dollars in a restaurant, Thigh High Chicken Co., LLC, pendente lite in violation of the automatic orders.[1]

The defendant did not file his tax returns for the two years prior to the dissolution action. The court found that he intentionally had delayed filing his taxes so that he could file them when the dissolution proceedings were over. Further, the court found that, because the defendant had commingled his business and personal finances and had no current employee who could attest to his income, the only way to determine his income was by looking at his historical annual earnings, his profit and loss statements that he had submitted into evidence, his bank account and credit card records, e-mail exchanges between the defendant and the companies Pedrali and emuamericas, LLC,[2] the testimony of his former employee, and by taking judicial notice of prior court orders and arrangements, such as the parties' agreement that the defendant would continue paying the family's household bills. The defendant also filed two financial affidavits with the court, in which he listed his total net weekly income, total weekly expenses and liabilities, total cash value of assets, and total liabilities after breaking down his expenses in detail.

On the basis of that evidence, the court found that the defendant's "actual income range [was] between $150,000 and $175,000 annually." Moreover, the court determined that the defendant's actual personal gross earnings for 2018, the calendar year in question, were $160,000.

Thereafter, the court ordered the defendant to pay alimony to the plaintiff based on the length of the parties' marriage, the reason for the breakdown of the marriage,[3] the disparity in the parties' earnings, the parties' earning capacities,[4] "as well as the myriad of factors in [General Statutes §] 46b-82 . . . ." In doing so, among other orders, the court awarded the plaintiff alimony for twenty years, a nonmodifiable term, during which the plaintiff was to receive $1500 per month from the defendant, which was nonmodifiable for the first five years. The court assigned any debts arising from the defendant's business ventures to the defendant, as well as any tax liabilities in the defendant's name and those tax obligations arising from his businesses. The defendant retained his interest in his companies and any interest he had in his mother's home. The plaintiff was ordered to pay all of the debts that she incurred.

The court awarded the family home to the plaintiff. The court found that the home had an approximate value of $477,000 with $127,000 remaining on the mortgage, and liens on the home in the amount of $203,000

due to the defendant's decision to use the home as collateral for his business loans. Consequently, there was only $147,000 of equity in the home. The court also ordered that, because the defendant was responsible for the business debts secured by the home, in the event that the plaintiff was to sell the home in the future, the defendant would be obligated to pay the plaintiff an amount sufficient to satisfy any remaining liens so that the net proceeds due to the plaintiff upon the sale would not be reduced by the amount of those liens, other than the mortgage, remaining on the property. The court further ordered that, in the event that the defendant is unable to pay the plaintiff or secure the release of the liens prior to the sale of the home, he must pay the plaintiff $18,000 per year until the full amount of the lien balances has been reduced to zero. The court ordered the defendant to make the $18,000 payments in order to reimburse the plaintiff for any amount of the sale proceeds that would have been used to pay the liens before the sale of the home, thereby reducing the amount of the encumbrances on the property. The court also ordered that, should the defendant procure releases or reductions for some of the liens prior to any sale, "it [would] reduce the total amount due to the [plaintiff] from him." The court also ordered that the defendant continue to seek releases of the business debts after the marital dissolution in order to clear the title to the home of the liens that were associated with his business debts.

The defendant filed a postjudgment motion for articulation on November 26, 2018. He sought to have the court articulate the factual basis for its findings as to his purported gross income, net income, and the basis for the court's distribution of the parties' assets and debts. The court granted the motion in part and issued an articulation. In its articulation, the court stated that, in fashioning its distribution of assets award, it took into consideration the defendant's dissipation of the $550,000 that he had obtained from the sale of his interest in emuamericas, LLC. Specifically, in fashioning its property allocation award, the court stated that it had included the $550,000 in the defendant's portion of the marital assets because it had found that he "received, concealed and spent approximately $550,000 in marital assets during the pendente lite period." The court stated that, by doing so, the parties were awarded an approximate equal share of the marital assets. The court also clarified its reasoning regarding the distribution of the parties' debts. The court based its division of the marital debts on its finding that the defendant had incurred debt and spent money frivolously during the pendente lite period in violation of the automatic orders. Particularly, the court had found that the defendant continued to accumulate credit card debt while failing to pay the household bills and mortgage as required by the pendente lite orders, and that the defendant also had

incurred debts associated with Thigh High Chicken Co., LLC. Noting that the defendant's representations of his financial status were given little weight due to his numerous misrepresentations to the court, the court explained that the defendant was assigned the debts related to the many failed business ventures that he had undertaken, most of which were undertaken without the plaintiff's knowledge and over which she exercised no control. The defendant himself stated that the plaintiff was not responsible for his business debts. This appeal followed.

Before addressing the defendant's claims, we set forth the well settled standard of review applicable to a court's decision regarding financial orders. "We review financial awards in dissolution actions under an abuse of discretion standard. . . . In order to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did." (Internal quotation marks omitted.) *Evans* v. *Taylor*, 67 Conn. App. 108, 111, 786 A.2d 525 (2001).

"In determining whether the trial court's broad legal discretion is abused, great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness." (Internal quotation marks omitted.) *Febbroriello* v. *Febbroriello*, 21 Conn. App. 200, 202, 572 A.2d 1032 (1990). "We apply that standard of review because it reflects the sound policy that the trial court has the unique opportunity to view the parties and their testimony, and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, including such factors as the demeanor and the attitude of the parties." (Internal quotation marks omitted.) *Hughes* v. *Hughes*, 95 Conn. App. 200, 203, 895 A.2d 274, cert. denied, 280 Conn. 902, 907 A.2d 90 (2006).

I

The defendant first claims that the court abused its discretion in issuing its financial orders by making a grossly disproportionate property distribution in the plaintiff's favor and assigning the majority of the marital debt to the defendant. We are not persuaded.

"Generally, we will not overturn a trial court's division of marital property unless it misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was [its] duty to regard." (Internal quotation marks omitted.) *Greco* v. *Greco*, 275 Conn. 348, 355, 880 A.2d 872 (2005). The defendant claims that the court made a grossly disproportionate property distribution in the plaintiff's favor by purportedly awarding the plaintiff $331,897 in assets while awarding him $53,964. The defendant expounds on his argument by positing that the court's financial award essentially will force him into "financial poverty" because the plaintiff

purportedly was awarded approximately 87 percent of the total marital assets compared to the defendant's 13 percent, where the defendant claims the total value of marital assets was $385,861.

"[General Statutes §] 46b-81 governs the distribution of the assets in a dissolution case. . . . That statute authorizes the court to assign to either spouse all, or any part of, the estate of the other spouse. . . . In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates." (Citations omitted; internal quotation marks omitted.) *Kent* v. *DiPaola*, 178 Conn. App. 424, 430–31, 175 A.3d 601 (2017). Moreover, "[w]e have iterated that there is no set formula the court is obligated to apply when dividing the parties' assets and . . . the court is vested with broad discretion in fashioning financial orders." (Internal quotation marks omitted.) Id., 441–42. As a panel of this court once expressed, the court has "vast discretion" in fashioning its orders. *Damon* v. *Damon*, 23 Conn. App. 111, 114, 579 A.2d 124 (1990).

At the outset, we note that the defendant's claim of disproportionality is factually untenable. The court found that the defendant received approximately $550,000 in lump sum payments over the course of a few months after selling his 12.5 percent interest in emuamericas, LLC, during the pendente lite period. The court determined that the payments for the defendant's interest in emuamericas, LLC, were marital assets subject to division by the court because they were earned entirely during the marriage. Notably, the court found that the defendant had misappropriated the $550,000, only later revealing that he had spent the entire sum. The court also found that the defendant spent all of this money on his own needs and wants and did not use any of this sum to pay down any of the family's debts or outstanding obligations. Specifically, the court found that the defendant failed to "pay down and secure releases for any of the over $200,000 worth of liens on the family home." In essence, the defendant dissipated a marital asset. "[D]issipation in the marital dissolution context requires financial misconduct involving marital assets, such as intentional waste or a selfish financial impropriety, coupled with a purpose unrelated to the marriage." (Internal quotation marks omitted.) *Gong* v. *Huang*, 129 Conn. App. 141, 153, 21 A.3d 474, cert. denied, 302 Conn. 907, 23 A.3d 1247 (2011). As correctly noted by the

court, the payments should have been "held secure or subject to the automatic orders," which the defendant failed to do; instead, he spent the entire sum in violation of the automatic orders.[5]

The defendant asserts that the court abused its discretion when it included the $550,000 payment in dividing the marital assets because the funds were no longer part of the marital estate. "[W]e reiterate that [t]he power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage. Without this wide discretion and broad equitable power, the courts in some cases might be unable fairly to resolve the parties' dispute . . . ." (Internal quotation marks omitted.) *Greco* v. *Greco*, supra, 275 Conn. 362.

Moreover, it has been established by our Supreme Court that a trial court can take the dissipation of assets into consideration when fashioning alimony orders in a dissolution action. See *O'Brien* v. *O'Brien*, 326 Conn. 81, 102–104, 161 A.3d 1236 (2017) (court is authorized to consider party's dissipation of marital assets and to reduce party's share of marital assets accordingly where party is found to have dissipated assets in violation of automatic orders).

As noted previously herein, the court found that the defendant was not a credible witness and, thus, gave no credence to his claims that he believed that the $550,000 belonged to him and that he could spend it without restrictions. We will not disturb credibility determinations made by the court. See *Greco* v. *Greco*, supra, 275 Conn. 359 (on appeal, "[w]e cannot retry the facts or pass on the credibility of the witnesses" (internal quotation marks omitted)). We cannot say that the court inaccurately determined that the defendant dissipated the $550,000 and expended this amount on himself where the record shows that he made expensive purchases and supported his paramours financially while the mortgage on the family home went unpaid and one of the children's cars was repossessed. See *Gershman* v. *Gershman*, 286 Conn. 341, 346, 943 A.2d 1091 (2008). Moreover, the defendant often was found to be in contempt during the pendency of this action for not making payments on the household bills and mortgage, as required under the pendente lite orders.

In *Greco*, our Supreme Court concluded that the trial court abused its discretion in awarding the plaintiff more than 98 percent of the marital property, alimony, and attorney's fees because the financial award far exceeded the defendant's income. *Greco* v. *Greco*, supra, 275 Conn. 349–50. Unlike the defendant in *Greco*, the defendant in the present case misappropriated and dissipated a marital asset of $550,000 for his own benefit in violation of the automatic orders, as none of the money was found to have paid off any of the family's obligations, including the liens levied on the family

home for debts owed as a result of the defendant's poor business decisions. The defendant fails to account for the fact that the debts apportioned to him included business obligations that he solely and unilaterally accumulated throughout the marriage, largely without the plaintiff's knowledge and over which the plaintiff had no control.

Consequently, we conclude that the court did not abuse its discretion as the distribution was not grossly disproportionate where the court found that the defendant misappropriated and dissipated $550,000 of marital assets in violation of the automatic orders, and the court merely reattributed those assets to the defendant, as the law permits. See *O'Brien* v. *O'Brien*, supra, 326 Conn. 102–104; *Shaulson* v. *Shaulson*, 125 Conn. App. 734, 736, 739–42, 9 A.3d 782 (2010), cert. denied, 300 Conn. 912, 13 A.3d 1102 (2011).

II

The defendant's second claim is that the court erred when it found that he had actual earned income or an earning capacity of $160,000 per year because there was no evidence to support such a finding. For the reasons that follow, we are not persuaded.

The defendant argues that the court erred in finding that he had an earning capacity of $160,000 in gross income per year. In making this claim, the defendant appears to have conflated earning capacity with actual earnings, as the transcript clearly shows that the court determined his actual earnings, not his earning capacity.[6] Because the court's orders were based on the defendant's actual earnings and not his earning capacity, we need to determine only whether the court had evidence before it from which it could have determined the defendant's actual earnings.

In finding that the defendant had actual earnings of $160,000, the court considered the defendant's past earnings and his spending history. Specifically, due to the defendant's lack of candor toward the court regarding his financial status, as noted previously in this opinion, in order to determine the defendant's actual earnings, the court took into consideration the defendant's past earnings from documents, such as those he submitted to the court detailing his historical earnings and liabilities, his bank accounts and credit card statements, and e-mail correspondence between the defendant and his employer and potential employer.

The defendant's reliance on *Keusch* v. *Keusch*, 184 Conn. App. 822, 195 A.3d 1136 (2018), to argue that the court's finding was based on insufficient evidence is misplaced. In *Keusch*, this court held that the trial court abused its discretion when it calculated the defendant's child support obligation on the basis of the defendant's earning capacity rather than his actual earnings without "first stating the presumptive support amount at which

it arrived by applying the guidelines and using the parent's actual income *and* second finding application of the guidelines to be inequitable or inappropriate." (Emphasis in original; internal quotation marks omitted.) Id., 829. The reasoning in *Keusch* on which the defendant relies has no bearing on the merits of the present case because the holding in *Keusch* was constrained by the requirements delineated under the child support guidelines and regulatory framework. See id.

Moreover, in the present case, the court indeed determined the defendant's actual earnings on the basis of ample evidence in the record. The evidence of his past earnings and his spending habits, as evidenced by his bank statements and credit card accounts, supported the court's finding that the defendant had actual earnings of $160,000. Thus, the defendant's second claim fails.

### III

The defendant next claims that the court erred by basing its alimony award solely on the defendant's gross income as opposed to his net income. Specifically, he asserts that the court made no effort to determine his net income in fashioning the alimony award and there was no evidence presented from which the court could have calculated his net income. We disagree.[7]

"It is well settled that a court must base child support and alimony orders on the available net income of the parties, not gross income." (Internal quotation marks omitted.) *Tuckman* v. *Tuckman*, 308 Conn. 194, 209, 61 A.3d 449 (2013); see also *Tobey* v. *Tobey*, 165 Conn. 742, 747, 345 A.2d 21 (1974) (establishing that gross earnings is not criterion for alimony awards, but net income available to defendant should be considered). "Although our case law consistently affirms the basic tenet that support and alimony orders must be based on net income, the proper application of this principle is context specific. . . . [W]e differentiate between an order that is a function of gross income and one that is based on gross income. . . . [T]he term based as used in this context connotes an order that only takes into consideration the parties' gross income and not the parties' net income. Consequently, an order that takes cognizance of the parties' disposable incomes may be proper even if it is expressed as a function of the parties' gross earnings." (Internal quotation marks omitted.) *Leonova* v. *Leonov*, 201 Conn. App. 285, 300,      A.3d      (2020).

"[We have] previously . . . overlooked the failure of the trial court to make a finding as to a party's net income. . . . We have concluded that such an omission does not compel the conclusion that the court's order was improperly based on gross income if the record indicates that the court considered evidence from which it could determine a party's net income, and it

did not state that it had relied on the party's gross earnings to form the basis of its order. . . .

"In *Kelman* v. *Kelman*, 86 Conn. App. 120, 123, 860 A.2d 292 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1079 (2005), this court rejected a similar claim on the ground that, although the trial court, in its decision, made reference to the parties' gross incomes, it did not expressly state that it was relying solely on gross earnings in framing its order." (Citation omitted.) *Leonova* v. *Leonov*, supra, 201 Conn. App. 300–301. Generally, when a court fails to state explicitly that an award for alimony is based on net income, it has been established that this failure does not automatically negate the validity of the award on appeal when there is ample evidence from which the court could have determined the parties' net income. See *Febbroriello* v. *Febbroriello*, supra, 21 Conn. App. 202–203 (trial court's award is not solely based on defendant's gross income where court had ample evidence "from which it could have determined the defendant's net income"); *Valentine* v. *Valentine*, 164 Conn. App. 354, 368–69, 141 A.3d 884 (trial court did not improperly base its decision on defendant's gross income because financial affidavits submitted as evidence reflected parties' net income after mandatory deductions and court stated it considered amount and sources of income in fashioning financial order), cert. denied, 321 Conn. 917, 136 A.3d 1275 (2016); *Hartney* v. *Hartney*, 83 Conn. App. 553, 558–59, 850 A.2d 1098 (trial court did not improperly base its alimony award on defendant's gross income where court did not make repeated references or comparisons to defendant's gross income, it heard testimony about parties' net and gross income, and its memorandum of decision stated that it took § 46b-82 into consideration when it fashioned award), cert. denied, 271 Conn. 920, 859 A.2d 578 (2004).

In the present case, the court found that the defendant was not credible because he made various misrepresentations to the court about his earnings and was less than candid toward the court in an effort to "deprive [the plaintiff] of financial support . . . ." The record reveals that the court assigned to the defendant a gross income of $160,000 for 2018 on the basis of the evidence before it.

As noted, the defendant failed to provide any tax information from which the court could ascertain his net income, leaving the court to derive the defendant's net income from the evidence it had. The court's decision reflects that it considered evidence such as the defendant's historical annual earnings, his profit and loss statements, his bank accounts and credit card records, various e-mail exchanges between the defendant and employers or potential employers, and the testimony of his former employee. The court also took judicial notice of prior court orders and arrangements

(such as the parties' agreement for the defendant to continue paying household bills). The defendant also had filed financial affidavits with the court pendente lite in which he had listed his total net weekly income while notating mandatory deductions (such as mandatory state and federal income tax deductions), total weekly expenses and liabilities, total cash value of assets, and his total liabilities after breaking down his expenses in detail. Although the court deemed the defendant's financial documents and business records to be untrustworthy standing alone, it took them and the defendant's spending habits into consideration in fashioning the alimony award.

Although the defendant argues that the court used "fictitious numbers" and had *no* evidence before it to support a finding of his net income, that argument is without merit for two principal reasons. First, as noted, the court found the defendant totally lacking in candor during the trial. Indeed, the court found that the defendant endeavored to misrepresent facts before the court. We have often said that a party who fails to provide information to the court will not later be heard to complain that the court made orders without sufficient information. See *Rosenfeld* v. *Rosenfeld*, 115 Conn. App. 570, 581, 974 A.2d 40 (2009) ("[w]here a party's own wrongful conduct limits the financial evidence available to the court, that party cannot complain about the resulting calculation of a monetary award" (internal quotation marks omitted)). Second, the court had before it evidence of the defendant's historic spending and previous findings regarding his routine deductions from gross income. In sum, the court considered the defendant's spending habits when it looked to the defendant's bank accounts and credit cards statements, as well as the other bills the defendant was required to and agreed to pay during the pendency of the proceedings. Moreover, it is not improper for a court to look at a party's financial affidavits and to consider the ample evidence before it to "determine the [party's] net income and the respective financial needs and abilities of each party." *Hughes* v. *Hughes*, supra, 95 Conn. App. 206–207.

On the basis of our careful review of the record, we cannot conclude that the court solely relied on the defendant's gross income to form the basis of its alimony award. We note, as well, that the court did not state that it relied on the defendant's gross income but, instead, merely referenced it, which is not improper. See id., 207. "Consequently, an order that takes cognizance of the parties' disposable incomes may be proper even if it is expressed as a function of the parties' gross earnings." Id.

Additionally, even though the court did not expressly state that it was basing the alimony award on the defendant's net income, "[o]ur Supreme Court has repeatedly held . . . that the trial court is not required to make

specific reference to the criteria that it considered in making its decision. . . . [W]e are . . . of the opinion that a trial court need not expressly state that it has considered the appropriate factors in reaching its decision. According the court every reasonable presumption in favor of the correctness of its decision, we assume that the court considered the appropriate statutory and evidentiary underpinnings in fashioning its financial orders." (Citation omitted.) Id., 207–208. Therefore, although the court did not expressly state that it considered the defendant's net income in determining the alimony award, we infer that the court considered the relevant statutory factors and all of the evidence submitted by the parties.

Accordingly, this claim fails.

IV

The defendant's final claim is that the court abused its discretion by awarding alimony to the plaintiff to punish him for his "alleged bad behavior." We disagree.

The purpose of alimony is not to punish but "to meet one's continuing duty to support . . . ." (Citation omitted.) *Weiman* v. *Weiman*, 188 Conn. 232, 234, 449 A.2d 151 (1982); see also *Greco* v. *Greco*, supra, 275 Conn. 361. In determining whether to award alimony, the court "shall consider the length of the marriage, the causes for the . . . dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and [any property] award . . . pursuant to section 46b-81 . . . ." General Statutes § 46b-82 (a).[8] Moreover, "[t]he court is not obligated to make express findings on each of these statutory criteria." *Weiman* v. *Weiman*, supra, 234.

In essence, the defendant argues that the court erred by taking his misdeeds into consideration when fashioning the alimony award and that doing so resulted in an alimony award designed to punish him. In pursuing this argument, the defendant ignores the breadth of § 46b-82 (a), which, inter alia, permits the court to take into consideration the causes for the breakdown of the marriage in fashioning its alimony award. Although the statute provides many factors that a court must consider upon determining whether to award alimony, there is no requirement that the court must weigh the factors equally. See *Horey* v. *Horey*, 172 Conn. App. 735, 741, 161 A.3d 579 (2017) ("The court is to consider these factors [under § 46b-82 (a)] in making an award of alimony, but it need not give each factor equal weight. . . . We note also that [t]he trial court may place varying degrees of importance on each criterion according to the factual circumstances of each case. . . . There is no additional requirement that the court specifically state how it weighed the statutory criteria or explain in

detail the importance assigned to each statutory factor." (Internal quotation marks omitted.)).

The court's findings that the defendant's extramarital affair with his twenty-two year old employee and his unilateral, poor business decisions led to the breakdown of the marriage is amply supported by the record. The court found that there was evidence that the defendant paid all of his paramour's bills, including those for her car insurance, car payment, gym membership, student loans, and credit card bills. The court also determined that the evidence supported the finding that the defendant and his paramour went on vacations or took trips together where they shared a hotel room, and that the defendant bought her expensive gifts and paid for all of her expenses in violation of the court's pendente lite orders.

Accordingly, we conclude that the court did not abuse its discretion by considering the defendant's extramarital affair and poor business decisions in fashioning the alimony award. The court is permitted to take into consideration all causes for the dissolution of the marriage in determining whether to award alimony. See *Dubicki* v. *Dubicki*, 186 Conn. 709, 715–16, 443 A.2d 1268 (1982).

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The plaintiff provided the defendant with notice of the automatic orders pursuant to Practice Book § 25-5, which provides in relevant part that "[n]either party shall incur unreasonable debts hereafter, including, but not limited to, further borrowing against any credit line secured by the family residence, further encumbrancing any assets, or unreasonably using credit cards or cash advances against credit cards." Practice Book § 25-5 (b) (5).

[2] After leaving emuamericas, LLC, the defendant entered into negotiations with another company, Pedrali, for a potential employment opportunity. After many months of negotiating, Pedrali eventually withdrew its offer of employment.

[3] The court found that the defendant was largely to blame for the breakdown of the marriage due to his extramarital affair with his twenty-two year old employee.

[4] As delineated in part II of this opinion, although the court referenced the earning capacities of the parties in its decision, its orders were based on the parties' actual earnings as determined by the court.

[5] "[W]hile the dissolution proceedings are pending, no party shall sell, transfer, [or] exchange any property without permission from the other party or the court. . . . The automatic orders are intended to keep the financial situation of the parties at a status quo during the pendency of the dissolution action." (Citation omitted; internal quotation marks omitted.) *O'Brien* v. *O'Brien*, 326 Conn. 81, 101, 161 A.3d 1236 (2017); see Practice Book § 25-5 (b) (1).

[6] Of course, in the proper case, a court may base its orders on a party's earning capacity; see *Tanzman* v. *Meurer*, 309 Conn. 105, 113–14, 70 A.3d 13 (2013); but because that was not the court's undertaking in this case, we do not discuss the propriety of finding earning capacity.

[7] We note that the plaintiff asserts in her appellate brief that the record is inadequate for us to review this claim because the defendant failed to adequately preserve it by failing to file a motion for review, presumably of the court's articulation. This argument is of no avail because the record is adequate for review as the basis of the court's orders is plain in the record.

[8] General Statutes § 46b-82 (a) provides in relevant part: "At the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other, in addition to or in lieu of an award pursuant to

section 46b-81. . . . In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider the evidence presented by each party and shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment."

———————————————————